USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ___________
DATE FILED: 11/17/26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DIAMIN BETHEA,

Plaintiff,

-against-

ALANTE SECURITY GROUP INC.,

Defendant.

24-CV-8010 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Diamin Bethea, who worked as a security guard for Alante Security Group Inc. (Alante) for approximately two and a half months in 2024, seeks damages from Alante for sexual harassment and retaliation. Plaintiff alleges that her initial supervisor, nonparty Carlos Iglesias, asked her to go out with him and requested that she send him nude pictures of herself. She further alleges that when she declined his requests she was "taken off the schedule" for work shifts, and that after she reported Iglesias's conduct to Alante management (by which time he had been fired for unrelated reasons), two other supervisors retaliated against her. One of those supervisors told plaintiff that her shoes were not in compliance with the Alante dress code. The other supervisor allegedly called her co-workers, at her work site, to check on her performance. After working a total of 28 shifts for Alante, plaintiff left the company voluntarily, having obtained another job, and then brought this action, asserting claims under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e *et seq.*; the New York State Human Rights Law (NYSHRL), New York State Executive Law § 296, *et seq.*, as amended; and the New York City Human Rights Law (NYCHRL), New York City Administrative Code § 8-101 *et seq.*

Now before the Court is defendant's motion (Dkt. 40) for summary judgment on all of plaintiff's claims. For the reasons that follow, the motion will be granted as to plaintiff's federal claims, and her state and local claims will be dismissed for lack of subject matter jurisdiction.

# I. BACKGROUND

## A. Evidence Presented

In support of its motion for summary judgment, defendant submitted (i) a memorandum of law (Dkt. 40-1) (Def. Mem.); (ii) the affidavit of Mark Bonilla, Alante's General Counsel and Quality Control Officer (Dkt. 40-2) (Bonilla Aff.); (iii) the affidavit of Valerie O'Connor, Alante's Director of Personnel Management (Dkt. 40-3) (O'Connor Aff.); (iv) the affidavit of Jose Aviles, an Alante Project Manager (Dkt. 40-4) (Aviles Aff.); (v) the affidavit of Alante's counsel of record David Feather (Dkt. 40-5) (Feather Aff.), attaching various exhibits (Dkts. 40-6 through 40-12); and (v) a Local Civil Rule 56.1 Statement of Undisputed Material Facts (Dkt. 40-13) (Def. 56.1 Stmt.), in which each statement of fact is supported by citation to admissible evidence.

In opposition to the motion, plaintiff submitted a Local Civil Rule 56.1 Counterstatement (Dkt. 42) (Pl. 56.1 Counterstmt.) and a memorandum of law (Dkt. 44) (Pl. Mem.), annexing two exhibits: screenshots showing plaintiff's text messages with various Alante personnel (Pl. Text Messages) (Dkt. 44-1); and plaintiff's complete deposition transcript (Dkt. 44-2) (Pl. Dep. Tr.).[1] In her Local Civil Rule 56.1 Counterstatement, plaintiff admits certain facts and disputes others – citing, in most instances, only her own deposition testimony. Additionally, as to numerous facts that plaintiff admits (or simply fails to dispute), she asserts supplemental facts – again citing to her own deposition testimony. *See, e.g.*, *id.* ¶¶ 12-16, 18, 20, 22, 24, 36, 44-47, 52-58, 68-69. As to more than one-quarter of the facts asserted by defendant, plaintiff neither admits them nor disputes them, but instead objects – in most instances on the ground that the asserted fact is "non-material." *See, e.g.*, *id.* ¶¶ 4-5, 8, 10-11, 17, 19, 23, 25, 31-32, 37, 41-43, 72-81.

---

[1] Neither party presents any other deposition testimony. The Court surmises that plaintiff did not conduct any fact depositions.

Where a fact asserted in a moving party's Local Rule 56.1 statement is properly supported by admissible record evidence, and is not "specifically denied and controverted" by the opposing party, that fact "will be deemed to be admitted" for purposes of the summary judgment motion. Local Rule 56.1(c); *see also Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."); *accord Wells v. Achievement Network*, 2021 WL 810220, at *1 n.1 (S.D.N.Y. Mar. 2, 2021); *Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012). Consequently, the Court deems admitted all of the facts set forth in defendant's Local Civil Rule 56.1 Statement that are not specifically denied and controverted by plaintiff. As required, however, the Court construes those facts "in the light most favorable to the non-moving party" and "resolve[s] all ambiguities and draw[s] all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir. 2004)).

The facts set forth below are undisputed unless otherwise indicated.

### B. Factual Background

#### 1. Plaintiff's Onboarding and Work Assignments

Plaintiff began her employment with defendant on February 17, 2024. Def. 56.1 Stmt. ¶¶ 1, 4; *see also* Feather Aff. Ex. C (Dkt. 40-8) (Timesheet) at ECF p. 2 (showing first day worked). At around the same time, she received Alante's "Workplace Anti-Discrimination, Harassment and Retaliation Policy." *Id.* ¶¶ 2, 42; Feather Aff. Ex. F (Dkt. 40-11) (Anti-Discrimination Policy), which states that Alante "will not tolerate discrimination or harassment in any form," and sets out Alante's "investigation procedure" for claims of prohibited conduct under the policy. Anti-Discrimination Policy at ECF pp. 2, 4. The first step in that procedure is for the reporting party to "complete a written complaint form," *id.* at ECF p. 4, which is attached to the Policy. *Id.* at ECF

pp. 7-8. Plaintiff was also given a memo – which she signed – listing various infractions that were "grounds for immediate termination," including being "out of uniform" and "post abandonment." Pl. Dep. Tr. at 91:19-92:6.[2]

On her first day of work at Alante, plaintiff was assigned to an overnight shift (11:00 p.m. to 7:00 a.m.) as an unarmed security guard at the Gatsby Hotel in Manhattan. Def. 56.1 Stmt. ¶¶ 4-5; Timesheet at ECF p. 2. Her supervisor was Iglesias, an Alante Field Supervisor. Def. 56.1 Stmt. ¶¶ 6, 14. However, that first shift, on February 17, 2024, was the only overnight shift she ever worked at the Gatsby Hotel, and the only shift for which Iglesias acted as her supervisor. *Id.* ¶ 7. Thereafter, plaintiff was assigned a morning shift at the Gatsby Hotel on February 19, 2024, *see* Timesheet at ECF p. 2; a morning shift at the Orchard Street Hotel on February 24, 2024, *see id.*; and multiple shifts at the Redford Hotel in early March 2024. *See id.* at ECF p. 3.

Beginning on March 22, 2024, plaintiff returned to the Gatsby Hotel, where she worked the morning shift (7:00 a.m. to 3:00 p.m.), as well as some evening shifts (3:00 p.m. to 11:00 p.m.), through May 6, 2024. *Id.* at ECF pp. 3-5. Project Manager Aviles explains that when plaintiff began work at Alante, she "was not assigned . . . a permanent schedule anywhere," but was "covering open shifts on a part-time basis." Aviles Aff. ¶ 6. Alante "was not able to offer Plaintiff a permanent schedule until March 18, 2025," when Aviles assigned her to the morning shift at the Gatsby Hotel. *Id.* ¶ 7.

**2. The Alleged Sexual Harassment by Iglesias**

Plaintiff alleges that she was sexually harassed by Iglesias. Def. 56.1 Stmt. ¶ 13. She testified that Iglesias (i) asked her out "on three or four occasions," including to celebrate his

[2] Although plaintiff was shown this document at deposition, and acknowledged her signature on the bottom, *see* Pl. Dep. Tr. at 90:20-25, the memo itself was not included in the summary judgment record.

birthday and to get dinner after work, *id.* ¶ 15; (ii) continued asking her out (did not "tak[e] no for an answer") after she turned down his initial date request, Pl. 56.1 Counterstmt. ¶ 15; (iii) requested that plaintiff send him pictures of herself, which she did, via text message, Def. 56.1 Stmt. ¶¶ 16-17; and (iv) requested "verbally" that she send him nude pictures of herself, which she declined to do. Pl. 56.1 Counterstmt. ¶ 16.

The text messages between plaintiff and Iglesias partially support plaintiff's account. On February 19, 2024, Iglesias informed plaintiff that he was "going to treat [him]self to a drink," but that "none of [his] friends [were] free." Pl. Text Messages at ECF p. 13. Plaintiff responded, "Where at[?]," to which Iglesias replied, "any place we can do it in [your] hood if u like." *Id.* Plaintiff later texted that she was "not coming out" because she was "home with [her] [k]ids," and Iglesias told her this was "[n]o [p]roblem." *Id.*

On February 19, 20, or 21, 2024, plaintiff sent Iglesias several pictures of herself fully clothed. Pl. Text Messages at ECF p. 8-10; *see also* Pl. Dep. Tr. at 78:8-17 (testifying that the pictures were sent on or about February 19); *id.* at 79:4-6 (testifying that they were sent on "the 19th, 20th, or 21st"). Iglesias asked if she had "[a]ny with red on," Pl. Text Messages at ECF p. 10, to which she responded, "[n]o red." *Id.* Iglesias then asked, "Can I get u something in red[?]," to which plaintiff responded, "I just told you I don't have anything[.] I don't even like sending out pics you just kept asking so I felt I had to[.]" *Id.* Iglesias replied, "Sorry I feel bad now[.]" *Id.* There are no further text communications between plaintiff and Iglesias regarding pictures. At deposition, plaintiff testified that the request for "naked pictures" was made "verbally," rather than in writing, approximately two weeks after she started work at Alante, and that plaintiff never sent any such pictures. Pl. Dep. Tr. 62:24-63:8.

In an undated message, Iglesias asked plaintiff if she wanted to celebrate his birthday with him. Pl. Text Messages at ECF p. 14. Plaintiff replied, "When[?]" *Id.* Iglesias asked her what day she preferred, and plaintiff replied, "Idk [I don't know] I'll let you know," adding, "not today I'm going home to sleep." *Id.* In another undated message, Iglesias suggested that he and plaintiff go food shopping together, but plaintiff explained that she "just went," and would not have to shop again "till around the 11th or 12th." *Id.* at ECF p. 15.

Iglesias never sent plaintiff any pictures of himself, never asked her to perform a sexual act, and never touched her. Def. 56.1 Stmt. ¶¶ 21-23; Pl. Dep. Tr. at 58:12-14, 62:17-23.

Plaintiff further alleges that she was removed from the overnight shift at the Gatsby Hotel because she refused to send more photos to Iglesias or go out with him. Def. 56.1 Stmt. ¶ 46; *see also* Pl. Dep. Tr. at 78:2-7 ("[A]fter I told him I no longer wanted to send him pictures, that's when my schedule was changed."). However, the summary judgment record does not support this claim. As noted above, plaintiff only worked one overnight shift at the Gatsby Hotel (on February 17) before she was given a morning shift on February 19, and then various shifts at other locations. At deposition, plaintiff testified that Iglesias told her that it was his supervisor's decision to transfer her out of the Gatsby Hotel. Def. 56.1 Stmt. ¶ 47; Pl. Dep. Tr. at 33:4-18, 34:15-17, 57:23-58:2. Likewise, Project Manager Aviles attests that he – not Iglesias – made the decision to "move Plaintiff from the Gatsby Hotel overnight shift to other locations after her first shift on February 17, 2024," due to "staffing needs," *see id.* ¶¶ 48-51; Aviles Aff. ¶¶ 6-9, and plaintiff acknowledged, at deposition, that for "[t]he first three weeks I didn't have a schedule. I was kind of bouncing around." Pl. Dep. Tr. at 66:5-7. At the time Aviles assigned plaintiff to shifts other than at the Gatsby Hotel, he was unaware of her sexual harassment allegations, *see* Def. 56.1 Stmt. ¶ 52; Aviles Aff. ¶ 8, which she did not report – to anyone – until approximately March 11, 2024. *See*

Part I(B)(3), *infra*. Plaintiff also testified that the day shift was better than the overnight shift. Def. 56.1 Stmt. ¶¶ 40-41; Pl. Dep. Tr. at 82:3-8.

Alante terminated Iglesias's employment on March 2, 2024, two weeks after plaintiff's employment commenced. Def. 56.1 Stmt. ¶¶ 14, 29. Iglesias was let go on Aviles's recommendation, due to poor work performance, including "failing to perform his duties in a satisfactory fashion, failing to physically visit all of his sites, and miscommunication with security guards regarding coverage and pay." *Id.* ¶ 30; *see also* Aviles Aff. ¶¶ 10-11; O'Connor Aff. ¶ 7; Feather Aff. Ex. E.[3] At the time Aviles made the recommendation to terminate Iglesias, he was unaware of plaintiff's sexual harassment allegations, Aviles Aff. ¶ 12, which she had not yet reported. In fact, at the time Iglesias was terminated, "there had been no complaints of sexual harassment against Mr. Iglesias, by Plaintiff or anyone." Def. 56.1 Stmt. ¶ 32; *see also* O'Connor Aff. ¶ 8; Aviles Aff. ¶ 12.[4]

---

[3] Exhibit E is Alante's "Employee Warning Record" (EWR) for Iglesias. It includes a recommendation by Aviles, dated February 26, 2024, that Iglesias be fired for insubordination and dereliction of duty, noting (among other things) that he "failed to follow directives or policies" and persisted in providing "misleading information" to officers regarding coverage for late work. EWR at 1. It also includes a note by Alante's Chief Operating Officer Nathan Roman, dated March 1, 2024, reading, "I concur. Notify the employee of the termination." *Id.*

[4] Plaintiff does not dispute this factual assertion. Instead, she objects on the ground that "the fact contained in the paragraph being objected to is a non-material fact." Pl. 56.1 Counterstmt. ¶ 32. Elsewhere, plaintiff suggests that Iglesias was fired because another employee had accused him of sexual harassment. *See, e.g.*, *id.* ¶ 30; Pl. Dep. Tr. at 36:4-22 (testifying that Field Supervisor Dennis Birden told her that "another employee came forward and said the same thing was happening to her and that's the reason why [Iglesias] was no longer there"). Beyond this inadmissible hearsay, however, plaintiff points to no evidence indicating that there were any previous harassment allegations against Iglesias. I therefore accept Alante's account of his termination – which is supported by the O'Connor and Aviles affidavits – as undisputed. *See Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 218 n.6 (2d Cir. 2000) ("Under Fed. R. Civ. P. 56, only admissible evidence may be used to resist a motion for summary judgment[.]"); *accord Barker v. Aramark Unif. & Career Apparel, LLC*, 2024 WL 4287242, at *6 (E.D.N.Y. Sept. 25, 2024), *aff'd*, 2026 WL 2874363 (2d Cir. Sept. 24, 2026).

### 3. Plaintiff Reports the Alleged Harassment

Plaintiff testified that at the end of March 2024, she telephoned Valerie O'Connor, Alante's Director of Personnel Management, and complained that Iglesias had altered her shift schedule because she did not want to go out with him. Def. 56.1 Stmt. ¶¶ 33, 35; *see also* Pl. Dep. Tr. at 25:6-27:19. She further testified that during the call O'Connor informed her that Iglesias had already been terminated. Pl. Dep. Tr. at 34:18-35:9.[5] Shortly after speaking with O'Connor, *see id.* at 35:10-19, plaintiff texted Field Supervisor Birden to ask if he had any open shifts for her. Def. 56.1 Stmt. ¶ 34; *see also* Pl. Text Messages at ECF p. 5. Plaintiff then sent Birden screenshots of some of Iglesias's text messages to her. Pl. Text Messages at ECF pp. 5-6. Birden responded with a "facepalm" emoji. Pl. Text Messages at ECF p. 6. Plaintiff followed up by texting, "I was happy where I was[.] . . . He removed me because I didn't want to go [o]n a date with him[.]" *Id.*[6]

On March 12, 2024, Birden texted plaintiff to "see if you could work this morning at Gatsby hotel," to which plaintiff replied, "Yea I can't today[.]" Pl. Text Messages at ECF p. 6. Sometime before March 17, 2024, Birden again asked plaintiff if she was able to work "right now," and she again replied that she could not. *Id.* at ECF p. 16. On March 17, plaintiff texted Birden again to request "morning shift[s]," and again complained that she "had a schedule [but] Carlos [Iglesias] really took it away. . . I never worked somewhere a supervisor give[s] you a schedule [and] take it back [be]cause you refuse to go out with them." *Id.* Birden responded the next day that he was

---

[5] O'Connor attests that she has no recollection of this conversation. *See* O'Connor Aff. ¶¶ 3-4. She states that she did not learn of plaintiff's allegations until after plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). *See id.* ¶ 5.

[6] Plaintiff's text messages to Birden are dated March 11, 2024. *See* Pl. Text Messages at ECF pp. 5-6. Thus, if plaintiff spoke to O'Connor before texting Birden – as she testified – she must have spoken to O'Connor on or before March 11, 2024, notwithstanding her testimony that she called O'Connor at the "end[] of March." Pl. Dep. Tr. at 27:18-19.

working on a "new schedule for" plaintiff. *Id.*; *see also* Aviles Aff. ¶ 7 (attesting that plaintiff was not offered a permanent schedule until March 18, 2024).

Beginning on March 22, 2024, plaintiff worked exclusively at the Gatsby Hotel. Def. 56.1 Stmt. ¶¶ 38-40; *see also* Timesheet at ECF pp. 3-5 (showing that plaintiff worked morning shifts at the Gatsby Hotel, as well as occasional afternoon shifts there, from March 22 through May 6, 2024). Plaintiff was "happy" with that schedule, which was "what [she] wanted." Pl. Dep. Tr. at 82:3-5.

**4. The Alleged Retaliation by Alante Supervisors**

Plaintiff contends that after she complained to O'Connor and Birden about Iglesias's conduct – and after she received the schedule she sought at the Gatsby Hotel – she was retaliated against by Mark Bonilla, Alante's General Counsel and Quality Control Officer, who "nitpicked" her compliance with the company dress code. Def. 56.1 Stmt. ¶ 53; *see also* Pl. Dep. Tr. at 97:21-98:14 (testifying that Bonilla "kept coming to nitpick with me"). Plaintiff further contends that Birden retaliated against her by calling the hotel and speaking to other workers there to inquire about her work performance. Def. 56.1 Stmt. ¶¶ 65-66; *see also* Pl. Dep. Tr. at 97:13-20 ("Dennis kept nitpicking with me," including by "call[ing] the facility and asking the other people in the Gatsby Hotel how was my work performance."). Plaintiff does not explain what would motivate either Bonilla or Birden (whom she credits with getting her back on the Gatsby Hotel schedule) to retaliate against her for complaining about an employee who had already been fired by Alante.

It is undisputed that, as part of his job duties, Bonilla visited the sites where Alante security guards were stationed, to ensure that all guards on duty were at their assigned posts, dressed appropriately, and performing their duties properly. Def. 56.1 Stmt. ¶¶ 56-57; Bonilla Aff. ¶ 6. Bonilla typically visited each site once a week. Def. 56.1 Stmt. ¶ 58; Bonilla Aff. ¶ 7. Bonilla recalls speaking to plaintiff (and another Gatsby Hotel guard) twice "regarding their failure to be

at their assigned post." Bonilla Aff. ¶ 8. Additionally, during one visit, Bonilla spoke to plaintiff about her footwear, "which was not in compliance with Alante Security's uniform policy. She was wearing sneakers, and I reminded her that uniform attire required black shoes." *Id.* ¶ 10. Bonilla attests: "These are reminders that I give to all guards – a dozen times a day – with the sole intention of creating a more professional looking staff." *Id.*[7] When he gave plaintiff these reminders, Bonilla was unaware of her sexual harassment allegations. Def. 56.1 Stmt. ¶ 62; Bonilla Aff. ¶ 12.[8] Bonilla never wrote plaintiff up or initiated any disciplinary action against her. Def. 56.1 St. ¶ 70; Bonilla Aff. ¶ 11; Pl. Dep. Tr. at 105:7-14, 107:12-14.

As for Birden, there is no non-hearsay evidence in the summary judgment record to support plaintiff's claim that he "would call the facility and ask the other people in the Gatsby Hotel how was [plaintiff's] job performance," Pl. Dep. Tr. at 97:14-16,[9] much less that he did so in retaliation for plaintiff having reported Iglesias's conduct. It is undisputed, however, that on May 5, 2024, Birden texted plaintiff at 3:30 p.m. to say: "You have to return to Post due to you not having a proper relief. If you don't this resolve [sic] in a write-up for abandoning Post." Pl. Text Messages

[7] Plaintiff repeatedly asserts, in conclusory terms, that Alante management "started insisting that Plaintiff wear black shoes as opposed to black sneakers in retaliation for her protected conduct." Pl. 56.1 Counterstmt. ¶¶ 53, 54. However, the only fact that plaintiff offers in support of this conclusion is that "these visits [by Bonilla] were in close proximity to her protected conduct." *Id.* ¶¶ 56-58. She points to no admissible evidence contradicting Bonilla's testimony that he visited every site weekly, and that he gave the same reminder to other guards "a dozen times a day." Bonilla Aff. ¶¶ 7, 10. Nor does she address the fact that her original supervisor – Iglesias – gave her the same reminder weeks earlier. *See* Pl. Text Messages at ECF p. 12 (text from "Supervisor Carlos" reading, "Please wear black shoes . . . For next time").

[8] Plaintiff asserts that there is "circumstantial evidence to say this is untrue," for example, "Field Supervisor Dennis Birden was very involved and had influence over the scheduling process." Pl. 56.1 Counterstmt. ¶ 62. Even assuming this to be true, however, it does not follow that Birden told Bonilla about plaintiff's sexual harassment allegations.

[9] At deposition, plaintiff conceded that she was "not part of any of these conversations." Pl. Dep. Tr. at 101:9-11. Her belief that these calls occurred is based on what she says she was told by other personnel at the Gatsby Hotel, none of whose names she could remember. *Id.* at 100:24-101:25.

at ECF p. 17. Plaintiff responded, "You can write me up because I have to get home to my child. . . . It's my kid['s] birthday!" *Id.* Birden replied, "You were supposed to call a supervisor and inform them that your relief is not on site. Then hold Post until we find a relief. We understand family celebrations, yet this is a job and we have to communicate." *Id.* From there, the exchange became testy:

| | |
|---|---|
| Plaintiff: | You don't even respond to me so when was I actually suppose[d] to reach out? You knew someone would be late [and] never let anyone know. You don't even communicate[.] |
| Birden: | So you do understand that the agreement upon hiring that you signed stated that if you Abandoned Post this could lead to a termination[?] |
| Plaintiff: | Every Saturday is an issue with reliefs in [sic] I have to be up for a double Monday. I wasn't staying today I can't I'm normally I do. |
| Plaintiff: | Nobody told me anything you never respond to me. I have messages saying so every Saturday it's this issue it's my child's birthday plus I have a double tomorrow!! I cannot wait for anyone today!!! |
| Birden: | I have messages also and call history of you not responding but it's fine. Thank you for your services, enjoy the rest of your day. |

*Id.* at ECF p. 18.

**5. Plaintiff's Departure from Alante**

The following day, May 6, 2024, plaintiff worked the morning shift at the Gatsby Hotel. *See* Timesheet at ECF p. 5. This brought her total Alante work shifts to 28. Def. 56.1 Stmt. ¶¶ 8, 73; *see also* Timesheet at ECF pp. 2-5.

Plaintiff's next scheduled shift for Alante was on May 12, 2024, at the Gatsby Hotel. Def. 56.1 Stmt. ¶ 75. On that day, when plaintiff failed to appear, Birden texted and called plaintiff, but she did not respond, because she had taken a new job. *Id.* ¶¶ 74, 76; *see also* Pl. Dep. Tr. at 96:9-11 (acknowledging that she was scheduled for the morning shift that day "but by that time I no longer respond [sic] to him because I had a new job and I did not return back to Alante"). Plaintiff

never told anyone at Alante that she was quitting; she just "didn't show up." Pl. Dep. Tr. at 97:2-6. It is undisputed that plaintiff left defendant's employ voluntarily. Def. 56.1 Stmt. ¶ 76; Pl. Dep. Tr. at 30:21-23.

And at no point before her departure from Alante did plaintiff request or complete the written complaint form attached to defendant's Anti-Discrimination Policy. *Id.* ¶ 44.

#### 6. Plaintiff's Prior Employment History and Lawsuits

Plaintiff worked at two other security companies prior to joining defendant: Winfield Security (Winfield) and Harvard Protection Services (HPS). Def. 56.1 Stmt. ¶ 77. Prior to bringing the present action, plaintiff sued both Winfield and HPS. *Id.* ¶ 81. Plaintiff's lawsuit against Winfield alleged pregnancy discrimination and retaliation. Def. 56.1 Stmt. ¶ 78; *see also* Complaint (Dkt. 1), *Bethea v. Winfield Security Corp.*, No. 23-CV-922-AT (S.D.N.Y. Feb. 3, 2024), and settled for $20,000. Pl. Dep. Tr. at 13:18-24. Her lawsuit against HPS alleged sexual harassment and retaliation, Def. 56.1 Stmt.¶ 78, and settled for $175,000. Pl. Dep. Tr. at 14:13-15:3.

### C. Procedural History

Plaintiff filed this action on October 22, 2024, five months after she left Alante and three months after she received a "Right to Sue" letter from the Equal Employment Opportunity Commission. *See* Compl. (Dkt. 1) ¶ 1 & Ex. A ("Dismissal and Notice of Rights" letter dated July 26, 2024). She asserts two federal claims, both pursuant to Title VII. In her First Claim, for "illegal discrimination," plaintiff alleges that she was subject to sexual harassment and a "hostile workplace." Compl. ¶ 20. In her Fifth Claim, for "illegal retaliatory discrimination," she alleges that she was "reprimanded" and subject to "h[e]ightened oversight" by Alante management (as well as "public gossiping," an allegation she does not pursue on summary judgment), "for her role

in asserting her protected rights[.]" *Id.* ¶¶ 36-37. Additionally, plaintiff asserts claims for harassment and retaliation under the NYSHRL and the NYCHRL. *See id.* ¶¶ 22-34, 38-41.

On December 11, 2024, the parties consented to my jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. Dkt. 19.

On October 3, 2025, after the completion of discovery, defendant moved for summary judgment as to all of plaintiff's claims. In its memorandum of law in support of its summary judgment motion, defendant argues that plaintiff's First Claim fails because Iglesias's conduct did not rise to the level of "severe" or "pervasive" behavior, as required to raise a triable claim for "hostile environment sexual harassment." Def. Mem. at 12-13. Defendant further argues that it is entitled to summary judgment based on the *Faragher/Ellerth* defense,[10] because it exercised reasonable care to prevent and correct sexually harassing behavior, but plaintiff failed to take advantage of the protective or corrective opportunities that it provided. *Id.* at 13-14. In any event, according to Alante, it is not vicariously liable for Iglesias's conduct because he was a low-level supervisor who only supervised plaintiff for one day. *Id.* at 17.

As to the Fifth Claim, for retaliation, defendant contends it cannot be liable for taking plaintiff off the night shift at the Gatsby Hotel because her shift assignments were made by an Alante manager "with no knowledge that Plaintiff was allegedly being sexually harassed." Def. Mem. at 20. Further, defendant argues, plaintiff cannot demonstrate a "causal connection" between plaintiff's complaints about Iglesias and the alleged "nitpicking" by Bonilla and Birden, because Bonilla did not even know she had made those complaints, *id.* at 19-20, and Birden's alleged conduct (for which plaintiff identifies no non-hearsay evidence) was "within [his] job duties as her

[10] *See Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

supervisor." *Id.* at 21. Thus, in defendant's view, plaintiff has "utterly failed to set forth any nexus between her complaints of sexual harassment (which occurred a month prior and involved an individual who was no longer employed) and Mr. Birden's actions." *Id.*

On October 17, 2025, plaintiff filed her Local Civil Rule 56.1 Counterstatement, and on October 20, 2025, she filed her memorandum in opposition to defendant's motion, in which she urges the Court to recognize that "[m]uch" of defendant's "illegal conduct" is "being concealed," and even if it were not, the "conduct of the Defendant's Supervisor and the work related injuries . . . are all illegal, under a Federal, State and City standard." Pl. Mem. at ECF p. 2.[11] Relying heavily on the "more plaintiff friendly" standards under the NYSHRL and the NYCHRL, *id.* at ECF p. 3, plaintiff argues that she lost her overnight shift at the Gatsby Hotel because she denied Iglesias's request for "nude pictures," and thus could not "perform her duties she sought." *Id.* at ECF pp. 6-7. As for the alleged retaliation by Bonilla and Birden, plaintiff highlights the "temporal proximity with regard to the illegal conduct of Carlos Iglesias, Dennis Burden, and Mark Bonilla," *id.* at ECF p. 10, from which she concludes that there is "a significant amount of circumstantial evidence pointing to illegal discrimination and a cover up[.]" *Id.* Plaintiff does not discuss the elements of or the standards applicable to Title VII claims, and never mentions the affidavits of Alante employees Aviles, Bonilla, or O'Connor.

On October 24, 2025, defendant filed its reply memorandum, arguing that plaintiff's Rule 56.1 Counterstatement is deficient in numerous respects. *See* Def. Reply (Dkt. 45) at 1. Additionally, defendant reiterates that Iglesias's conduct was not sufficiently "severe or pervasive" to be actionable under Title VII, *id.* at 2-3; that it cannot be imputed to Alante, because plaintiff

[11] Plaintiff's brief, which is not a model of clarity, also lacks a table of contents, a table of authorities, internal page numbers, and the word-count certification required by Local Civil Rule 7.1(c).

failed to follow the Anti-Discrimination Policy and because Iglesias only supervised her for one overnight shift, *see id.* at 3-4; and that her conclusory allegation that she was "nitpicked" by Bonilla and Birden in retaliation for complaining about Iglesias to O'Connor and Birden is insufficient to overcome defendant's motion where there is no admissible evidence to support her "speculation and conjecture." *Id.* at 4-8.

## II. SUMMARY JUDGMENT STANDARDS

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 128-29 (2d Cir. 1996). The moving party bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact. Fed. R. Civ. P. 56(c); *Celotex,* 477 U.S. at 322; *Koch v. Town of Brattleboro,* 287 F.3d 162, 165 (2d Cir. 2002). In evaluating the record, the court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 87 (2d Cir. 2008); *Brod*, 653 F.3d at 164.

If the moving party meets its initial burden, the burden then shifts to the non-moving party to establish a genuine dispute of material fact, *Celotex,* 477 U.S. at 322; *Beard v. Banks*, 548 U.S. 521, 529 (2006); *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001), by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). To defeat summary judgment,

she must present specific, admissible evidence in support of her contention that there is a genuine dispute as to those facts. *Celotex,* 477 U.S. at 324; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005); *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (nonmoving party must offer "some hard evidence showing that its version of the events is not wholly fanciful"). Furthermore, the evidence must be sufficient to permit a reasonable jury to return a verdict in the non-moving party's favor. *Anderson,* 477 U.S. at 242, 248. By the same token, "[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation omitted); *see also Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir. 1996) ("[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment.").

In this District, these principles are incorporated into Local Civil Rule 56.1, which requires that a party moving for summary judgment submit a statement with numbered paragraphs setting forth "the material facts as to which the moving party contends there is no genuine issue to be tried." The opposing party must specifically controvert each numbered paragraph of the movant's statement in a corresponding paragraph of its own. Local Civ. R. 56.1(c). If the opposing party fails to do so, that paragraph is deemed admitted. *Id.*; *see also Giannullo*, 322 F.3d at 140.

Each statement by the moving or opposing party, "including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." Local Civ. R. 56.1(d). "A genuine dispute of fact does not exist merely because a litigant makes conclusory allegations to raise a

dispute, particularly if the underlying evidence contradicts the litigant's assertion." *Blue v. City of New York*, 2018 WL 1136613, at *2 (S.D.N.Y. Mar. 1, 2018).

## III. DISCUSSION

### A. Sexual Harassment

Plaintiff's First Claim alleges that she was sexually harassed by Carlos Iglesias in violation of Title VII. *See* Compl. ¶¶ 17-21. "There are two types of sexual harassment claims: (1) claims based on direct discrimination (also called *quid pro quo* sexual harassment), and (2) claims based on a hostile environment due to sexual harassment." *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011); *see also Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir. 1998) ("A plaintiff seeking relief against an employer for sexual harassment in the work place can proceed under two theories: quid pro quo harassment and a hostile work environment."); *Capaldo v. Remington Long Island Emps.*, 2023 WL 2710251, at *8 (E.D.N.Y. Mar. 30, 2023) (same). Quid pro quo sexual harassment "occurs when an employer alters an employee's job conditions or withholds an economic benefit because the employee refuses to submit to sexual demands," while hostile work environment harassment "occurs when an employer's conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Bermudez*, 783 F. Supp. 2d at 579 (internal quotation marks omitted) (quoting *Carrero v. New York City Housing Authority*, 890 F.2d 569, 577 (2d Cir. 1989)).

Plaintiff Bethea appears to rely primarily upon a *quid pro quo* theory: that Iglesias took her off the schedule for the overnight shift at the Gatsby Hotel – thus altering her job conditions and/or withholding an economic benefit – because she declined to date him or send him nude pictures. *See*, *e.g.*, Pl. Mem. at ECF pp. 2, 7 (Iglesias "took the Plaintiff off of the schedule for declining

[his] requests, and offers"); *id.* at ECF pp. 3, 8 n.4 (plaintiff experienced "a change in her schedule in response to [Iglesias] not being successful in his amorous intentions"). Defendant, for its part, construes plaintiff's First Claim as asserting that Iglesias created a hostile workplace environment. *See*, *e.g.*, Def. Mem. at 12 (arguing that Iglesias's behavior was not sufficiently "severe" or "pervasive" to be actionable under a hostile workplace environment theory). I therefore consider both theories.

**1. Quid Pro Quo – Legal Standard**

To succeed on a *quid pro quo* claim under Title VII, "the plaintiff must show a tangible employment action, *i.e.*, that an explicit alteration in the terms or conditions of employment resulted from her refusal to submit to the defendant's sexual advances." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (cleaned up); *see also Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir. 1992) ("Under a 'quid pro quo' theory, the plaintiff-employee must establish that she was denied an economic benefit either because of gender or because a sexual advance was made by a supervisor and rejected by her."). "A tangible employment action usually constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Schiano*, 445 F.3d at 604 (internal quotation marks and citation omitted); *accord Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 57 (2d Cir. 2004).

**2. Quid Pro Quo – Application**

Construed in the light most favorable to plaintiff, as required, the admissible evidence before this Court shows that Iglesias, who acted as her supervisor for one overnight shift at the Gatsby Hotel, *see* Def. 56.1 Stmt. ¶ 7, asked plaintiff to go out with him several times, which she declined to do, *see id.* ¶ 15; Pl. Text Messages at ECF pp. 13-15; asked her to send pictures of herself, which she did, *see* Def. 56.1 Stmt. ¶ 16-18; Pl. Text Messages at ECF pp. 8-10; Pl. Dep.

Tr. at 78:8-17; and asked her verbally to send nude pictures, which she declined to do. *See* Pl. 56.1 Counterstmt. ¶ 16; Pl. Dep. Tr. 62:24-63:8. At around the same time, plaintiff was assigned to work shifts other than the overnight shift at the Gatsby Hotel. *See* Timesheets at ECF pp. 2-3; Pl. Dep. Tr. at 78:4-6 ("[A]fter I told him I no longer wanted to send him pictures, that's when my schedule was changed.").

From these facts, plaintiff concludes that Iglesias must have taken her "off the schedule" because she declined his requests. Pl. Mem. at 2, 3, 7. However, she has presented no evidence that she was ever "on the schedule" for regular overnight shifts at the Gatsby Hotel; no evidence that Field Supervisor Iglesias controlled her work schedule; and no evidence that Project Manager Aviles – who did – knew anything about Iglesias's allegedly harassing conduct (which plaintiff had not yet reported to anyone at Alante). To the contrary: the record contains uncontradicted evidence that during plaintiff's first few weeks at Alante she was "covering open shifts on a part-time basis"; that during this period Aviles made the decision to "move Plaintiff from the Gatsby Hotel overnight shift to other locations" due to "staffing needs"; and that Iglesias did not "have any input into this decision." Def. 56.1 Stmt. ¶¶ 48-51; Aviles Aff. ¶¶ 6-9.[12] As plaintiff concedes, Iglesias himself told plaintiff – at the time – that it was his supervisor's decision to move her to other locations. Pl. Dep. Tr. at 33:4-18, 34:15-17, 57:23-58:2.

Moreover, plaintiff cannot point to any "significant change in employment status," *Schiano*, 445 F.3d at 604, as required to prevail on a *quid pro quo* claim. She was not fired, demoted, disciplined, or "reassign[ed] with significantly different responsibilities." *Id.* Instead, the objective evidence shows that after a single overnight shift at the Gatsby Hotel on February 17,

[12] At one point plaintiff testified that during her first three weeks at Alante she had a "set schedule" on the overnight shift. Pl. Dep. Tr. at 65:20-66:1. A moment later, however, she clarified that for "[t]he first three weeks I didn't have a schedule. I was kind of bouncing around." *Id.* at 66:3-7.

plaintiff was given shifts (at different times and/or different hotels) on February 19 and 24, and then again on March 3, 4, 5, 6, and 9, 2024, before being permanently assigned to the Gatsby Hotel later in March.[13] Timesheet at ECF pp. 2-3. All shifts were paid at the same hourly rate, Pl. Dep. Tr. at 82:9-15, and the morning shift was "better" than the overnight shift. Def. 56.1 Stmt. ¶¶ 40-41; Pl. Dep. Tr. at 82:3-8.

In place of admissible evidence, plaintiff attempts to raise a "metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, through conjecture, speculation, and intuition. *See, e.g.*, Pl. Dep. Tr. at 26:10-21 (plaintiff told O'Connor that she "*felt* like [her] schedule was changed," because she "was just bouncing around from different locations," and she "*felt* like [it was] because [she] didn't want to go out with him"); *id.* at 55:1-5 (plaintiff did not know that Iglesias was fired and "*thought* he was not responding because [she] declined him on several dates"); Pl. 56.1 Counterstmt. ¶ 14 ("Generally, the plaintiff *feels* that there is a coverup in regards to Carlos Iglesias.") (emphases added).

It is well-settled, however, that a plaintiff may not rely on her subjective "feelings and perceptions" to defeat summary judgment. *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 75 (2d Cir. 2015) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 456 (2d Cir. 1999)); *see also Guzman v. City of New York*, 93 F. Supp. 3d 248, 257 (S.D.N.Y. 2015) ("A plaintiff's 'subjective feelings' concerning an employment action cannot establish that the action was materially adverse," as required to succeed on a Title VII claim); *Rosario v. Hilton Worldwide, Inc.*, 2011 WL 336394, at *4 (E.D.N.Y. Jan. 24, 2011) (granting summary judgment to employer because plaintiff's "gut feelings, however genuine, do not allow for an inference of discrimination to be

[13] Additionally, plaintiff was offered shifts on March 12 and 16, 2024, which she declined. *See* Pl. Text Messages at ECF pp. 6, 16.

drawn"), *aff'd sub nom. Rosario v. Hilton Hotels Corp.*, 476 F. App'x 900 (2d Cir. 2012) (summary order); *Adeniji v. Admin. for Child. Servs., NYC*, 43 F. Supp. 2d 407, 424 (S.D.N.Y. 1999) ("plaintiff cannot satisfy his burden of proof by offers of speculative beliefs and gut feelings") (quoting *Burrell v. Bentsen,* 1993 WL 535076 at *10 (S.D.N.Y. Dec. 21, 1993), *aff'd mem.*, 50 F.3d 3 (2d Cir. 1995)).

Here, plaintiff has offered nothing beyond her subjective "feelings and perceptions," *Ya-Chen Chen*, 805 F.3d at 75, to support key elements of her *quid pro quo* sexual harassment claim, including that that Iglesias "took her off the schedule" for overnight shifts at the Gatsby Hotel, Pl. Mem. at 2, 3, 7, and that she experienced a "significant change in employment status," *Schiano*, 445 F.3d at 604, during her first three weeks of work for Alante. Plaintiff has therefore failed to raise a triable issue of material fact as to her *quid pro quo* claim under Title VII, entitling defendant to summary judgment.

### 3. Hostile Work Environment – Legal Standard

To establish a hostile work environment claim, a Title VII plaintiff must "show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Duplan v. City of New York*, 888 F.3d 612, 627 (2d Cir. 2018) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010)). "A plaintiff must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." *Gorzynski*, 596 F.3d at 102.

"As a general matter, 'isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive.'" *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1306 (2d Cir.

1995); *see also, e.g.*, *Faragher*, 524 U.S. at 788 ("[O]ffhand comments[] and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"). "The standard for a hostile work environment claim is a demanding one," *Croswell v. Triborough Bridge & Tunnel Auth.*, 2007 WL 2274252, at *9 (S.D.N.Y. Aug. 7, 2007); *accord Scott v. Mem'l Sloan-Kettering Cancer Ctr.*, 190 F. Supp. 2d 590, 599 (S.D.N.Y. 2002), and "[a] plaintiff must meet a high bar to state a claim for a hostile work environment." *Goldstein v. City Univ. of New York*, 2026 WL 2532245, at *13 (S.D.N.Y. Aug. 27, 2026).

**4. Hostile Work Environment – Application**

Plaintiff's hostile work environment claim rests on the same conduct underpinning her *quid pro quo* claim: that over a period of approximately two weeks (from February 17, 2024, when she began work at Alante, to March 2, 2024, when he was fired), Iglesias asked her out several times, even though she declined his initial invitation, and requested pictures of her, including nude pictures, which she did not provide. The text communications between plaintiff and Iglesias are neither overtly sexual nor otherwise abusive.[14] As noted above, it is undisputed that Iglesias never sent plaintiff any pictures of himself, never asked plaintiff to perform a sexual act, and never touched plaintiff physically. Def. 56.1 Stmt. ¶¶ 21-23; Pl. Dep. Tr. at 58:12-24, 62:17-23.

Iglesias's conduct, while no doubt "irritating and unwelcome," *Hsueh v. The New York State Dep't of Fin. Servs.*, 2017 WL 3671179, at *5 (S.D.N.Y. Aug. 24, 2017), falls short of the "high bar" required for a hostile work environment claim. *Goldstein*, 2026 WL 2532245, at *13. Indeed, courts in our Circuit frequently reject Title VII claims based on considerably more extreme

[14] To the contrary: when plaintiff told him, by text, that she felt pressured to send him pictures of herself (fully clothed), Iglesias apologized. *See* Pl. Text Messages at ECF p. 10 ("Sorry I feel bad now[.]"). And when she declined to have a drink with him because she was "home with [her] [k]ids," Iglesias responded, "No [p]roblem." *Id.* at ECF p. 13.

and longer-lasting conduct – which, "although certainly inappropriate for a workplace," does not rise (or sink) to the level required to "support a claim of discriminatory harassment." *Capaldo*, 2023 WL 2710251, at *11-13 (granting summary judgment to defendant where, on multiple occasions over an eleven-month span, plaintiff's general manager asked her out, informed her he was in love with her, hugged her, and put his hands around her); *see also*, *e.g.*, *Hsueh*, 2017 WL 3671179, at *5 (granting summary judgment to defendant where, over a period of six months, higher-ranking employee stared at plaintiff's "face, chest, and legs on multiple occasions," grabbed her arm, repeatedly asked her for her telephone number, called her while she was on vacation, left a voicemail saying he missed her and wanted to hear her voice, kissed her in the elevator, called her six times over three days, and "followed her around" at a company picnic); *Grossman v. The Gap, Inc.,* 1998 WL 142143, at *6 (S.D.N.Y. Mar. 25, 1998) (granting summary judgment to defendant where supervisor repeatedly called plaintiff at home and asked her out on dates, followed her around the store, asked her to model a bathing suit, and made a rude, sexually suggestive comment); *Gonzalez v. Kahan,* 1996 WL 705320, at *3-4 (E.D.N.Y. Nov. 25, 1996) (granting summary judgment to defendant because one obscene phone call, a bear hug, several requests for dates, and a marriage proposal – all from the same supervisor – were insufficient to establish a hostile work environment claim).

Here too, the incidents of which plaintiff complains "are simply not pervasive or severe enough to alter the terms and conditions of [Bethea's] employment and create an abusive working environment." *Hsueh*, 2017 WL 3671179, at *6. Since "[n]o reasonable jury could conclude otherwise," *id.*, defendant is entitled to summary judgment as to plaintiff's hostile work environment claim under Title VII. The Court does not reach the question of vicarious liability or the *Faragher/Ellerth* defense.

### B. Retaliation

#### 1. Legal Standard

Plaintiff's Fifth Claim alleges that she was subjected to "h[e]ightened oversight" in retaliation for complaining about Iglesias's conduct to Alante management. Compl. ¶ 36. To establish a *prima facie* retaliation case under Title VII, a plaintiff must show that: (1) she engaged in protected activity; (2) the defendant was aware of the activity; (3) the defendant took a materially adverse action against her; and (4) there is a causal connection between the protected activity and the adverse action. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). If the plaintiff establishes a *prima facie* case, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the employment action." *Hinton v. City Coll. of New York*, 2008 WL 591802, at *24 (S.D.N.Y. Feb. 29, 2008) (Lynch, J.). Once such a reason is articulated, "the plaintiff must, through admissible evidence, show that retaliation was a substantial reason for the adverse action, and that the employer's articulated reasons for the action are merely a pretext for retaliation." *Id.*

"In the context of retaliation, 'adverse employment action' is broader than it is in the context of discrimination," *Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298, 309 (2d Cir. 2017), and is "not limited to discrimination actions that affect the terms and conditions of employment." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). Nonetheless, the anti-retaliation provision of Title VII "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant," that is, actions that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 57. "Actions that are 'trivial harms' – i.e., 'those petty slights or minor annoyances that often take place at work and that all employees experience' – are not materially adverse." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (quoting *White,* 548 U.S. at 57); *accord Shultz*, 867 F.3d at 309; *Hicks v. Baines*, 593

F.3d 159, 165 (2d Cir. 2010). Under the standard announced in *White*, "[m]aterial adversity is to be determined objectively based on the reactions of a reasonable employee." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2012); *accord Tepperwien*, 663 F.3d at 568.

### 2. Application

Plaintiff contends she was retaliated against by Bonilla and Birden for reporting Iglesias's sexual harassment. *See* Pl. Mem. at ECF p. 10. As to Bonilla, defendant's Quality Control Officer, plaintiff complains that when he visited the Gatsby Hotel, where she was stationed, he "nitpicked" her shoes for not being in compliance with defendant's dress code. *See* Def. 56.1 Stmt. ¶ 53; Pl. Counterstmt. ¶¶ 54-55; Bonilla Aff. ¶¶ 8, 10; Pl. Dep. Tr. at 97:21-98:14. As to Birden, plaintiff's Field Supervisor, she asserts – based entirely on what she says she was told by other unnamed individuals – that he called the Gatsby Hotel and talked to other workers there to inquire about plaintiff's work performance. Def. 56.1 Stmt. ¶ 65; Pl. Dep. Tr. at 97:13-20. Additionally, it is undisputed that Birden texted plaintiff on May 5, 2024, to warn her that she faced disciplinary action for leaving her post before her replacement arrived, to which plaintiff responded, "You can write me up because I have to get home to my child." Pl. Text Messages at ECF p. 17. Birden did not, however, write plaintiff up. Nor did he – or anyone else at Alante – ever initiate any disciplinary action against her. *See* Def. 56.1 Stmt. ¶ 70; Pl. Dep. Tr. at 105:7-14, 107:12-14.

Construed in the light most favorable to plaintiff, as required, the record is insufficient to permit a reasonable jury to return a verdict in plaintiff's favor on her Title VII retaliation claim, because she cannot establish the third element of her *prima facie* case: that Alante took a "materially adverse" action against her after she complained about Iglesias. As noted above, plaintiff has not adduced any admissible evidence supporting her claim that Birden called her co-workers at the Gatsby Hotel to check on her performance. But even if he did, neither his conduct nor Bonilla's would constitute "materially adverse" action as that term is used in the retaliation

context. Plaintiff was never fired, demoted, disciplined, or even given a formal warning. Nor was she reassigned to less favorable locations or shifts. To the contrary: from March 22 through May 12, 2024 – the day she quit – plaintiff was consistently given daytime shifts at the Gatsby Hotel, *see* Timesheet at ECF pp. 3-5, which was "what [she] wanted." Pl. Dep. Tr. at 82:3-5; *see Tepperwien*, 663 F.3d at 571 (plaintiff's switch to the night shift "was not materially adverse because, as his own testimony makes clear, Tepperwien requested it").

Plaintiff is thus left with the argument that she "suffered heightened oversight" after she complained about Iglesias, Pl. Mem. at ECF pp. 2-3, in the form of "nitpicking" by Bonilla (who verbally cautioned her about her footwear) and increased scrutiny by Birden (who allegedly called her coworkers for information concerning her job performance). It is well-settled, however, that – except in the most extreme cases – "excessive scrutiny is not an actionable adverse employment action" for purposes of a federal retaliation claim. *Thomson v. Odyssey House*, 652 F. App'x 44, 46 (2d Cir. 2016) (summary order) (affirming grant of summary judgment to defendant where plaintiff claimed that she was subjected to "closer supervision" after making internal complaints of discrimination). Likewise, "criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action." *Tepperwien*, 663 F.3d at 570 (quoting *Weeks v. N.Y. State (Div. of Parole),* 273 F.3d 76, 86 (2d Cir. 2001), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002)); *see also Chang v. Safe Horizons*, 254 F. App'x 838, 839 (2d Cir. 2007) (summary order) (affirming grant of summary judgment for defendant where the alleged retaliation consisted of "oral and written warnings issued by [plaintiff's supervisor] Stewart, her being questioned by Stewart, and Stewart's attempt to access [plaintiff's] computer," which "do not constitute 'materially adverse' actions in the view of a 'reasonable employee,'"); *Capaldo*, 2023 WL 2710251,

at *18 (granting summary judgment to employer where the alleged retaliation consisted of critical emails, increased oversight by plaintiff's manager, who "started copying HR on every email to her," and the issuance of a non-disciplinary "expectations memo"); *Kasperek v. New York State, Dep't of Corr. & Cmty. Supervision*, 2021 WL 6755198, at *15 (W.D.N.Y. Aug. 31, 2021) (recommending grant of summary judgment to employer where alleged retaliation included "tracking [her] attendance and time off," because "[t]his type of excessive scrutiny and close monitoring does not constitute an adverse action"), *adopted,* 2022 WL 682633 (W.D.N.Y. Mar. 8, 2022); *Mitchell v. Metro. Transit Auth. Cap. Constr. Corp.*, 2018 WL 3442895, at *12-13 (S.D.N.Y. July 17, 2018) (employer's actions after plaintiff filed a discrimination complaint, including forbidding her to work with interns and requiring her to inform her supervisor "of her daily work plan and of any time she would be out of the office," were "not materially adverse and thus not sufficient to discharge [plaintiff's] prima facie burden" on her retaliation claim); *Mabry v. Neighborhood Def. Serv.*, 769 F. Supp. 2d 381, 393 (S.D.N.Y. 2011) ("Excessive scrutiny and close monitoring without more do not constitute adverse employment action[.]").

Here too, even viewed in the light most favorable to plaintiff, the evidence shows only that – while still a fairly new Alante employee – she was closely supervised by Bonilla, who spoke to her about her shoes, and by Birden, who allegedly asked other employees about her performance and who threatened to write her up (although he never did) for leaving her post before her replacement arrived.[15] "[T]hese employment actions amount to nothing more than increased workplace scrutiny occurring over a [two]-month period that did not result in any discipline or discharge, and is too minor to establish injurious retaliatory conduct." *Capaldo*, 2023 WL

[15] Plaintiff does not rely on the threatened write-up, *see* Pl. Text Messages at ECF p. 17, to support her retaliation claim. Nor could she, given the undisputed evidence that "post abandonment" was grounds for "immediate termination." Pl. Dep. Tr. at 91:19-92:6.

2710251, at *18. Put another way, the conduct of which plaintiff complains would not "dissuade a reasonable worker from making or supporting a charge of discrimination," *White*, 548 U.S. at 64, and thus is not actionable as retaliation.

Since no reasonable jury could conclude that Alante took any "materially adverse" action against plaintiff, it is entitled to summary judgment on her Title VII retaliation claim. The Court does not reach Alante's argument that there was no "nexus" between plaintiff's complaints about Iglesias and the quality of supervision she received from Bonilla and Birden.

**C. Supplemental Jurisdiction**

Where, as here, a district court dismisses "all claims over which it has original jurisdiction," it may "decline to exercise supplemental jurisdiction" over related claims brought under state or local law. 28 U.S.C. § 1367(c)(3). Although the statute is phrased in permissive terms, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *accord Robertson v. MetLife Sec., Inc.*, 779 F. App'x 783, 786 (2d Cir. 2019) (summary order); *Valencia v Sung M. Lee*, 316 F.3d 299, 305-07 (2d Cir 2003).

In its moving brief, defendant expressly argues that in the event this Court "dismisses Plaintiff's First and Fifth Causes of Action, which are the only causes of action based on federal law . . . it should . . . decline to exercise supplemental jurisdiction over the Plaintiff's New York State and New York City causes of action." Def. Mem. at 24. In her opposition brief, plaintiff offers no resistance. Consequently, the Court declines to exercise supplemental jurisdiction over plaintiff's NYSHRL and NYCHRL claims. *See, e.g.*, *Hsueh*, 2017 WL 3671179, at *8 ("Because

the Court grants the DFS's motion for summary judgment on Hsueh's sole federal-law claim, the Court declines to exercise supplemental jurisdiction over Hsueh's state-law claims").

## IV. CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is GRANTED as to both of plaintiff's Title VII claims, which are DISMISSED WITH PREJUDICE. The Court declines to exercise supplemental jurisdiction over plaintiff's remaining claims under state and local law, which are DISMISSED WITHOUT PREJUDICE. The Clerk of Court is respectfully directed to enter judgment accordingly and close the case.

Dated: New York, New York
November 17, 2026

**SO ORDERED.**



**BARBARA MOSES**
**United States Magistrate Judge**